UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
-----------------------------X
REGINA LINK LANE,              :
                Plaintiff      :
                               :
                               :
        v.                     :    3:02-CV-579 (EBB)
                               :
                               :
COMPASS GROUP USA, INC.,       :
                Defendant      :
-----------------------------X
```

## RULING ON MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

Plaintiff Regina Link Lane ("Plaintiff" or "Lane") commenced this litigation against her former employer, Compass Group USA, Inc. ("Defendant" or "Compass") in the Superior Court for the State of Connecticut, Judicial District of Litchfield at Litchfield.  Compass timely removed the case to this Court, based on federal question jurisdiction.  Count Four of the Complaint alleges that Defendant violated the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), a subchapter of the Employee Retirement Income Security Act ("ERISA"), Sections 1161, et. seq, by failing to give Lane timely notice of certain insurance rights thereunder.

At the time of removal, Compass also asserted supplemental jurisdiction, inasmuch as Count One of the Complaint alleges retaliatory discharge in violation of the Connecticut Workers' Compensation Act.  Counts Two and Three further purported to set forth state court claims, but both have now been withdrawn by

Plaintiff.

Defendant's Motion for Summary Judgment, then, is left pending against the two remaining counts.

## STATEMENT OF FACTS

The Court sets forth only those facts deemed necessary to an understanding of the issues raised in, and decision rendered on, this Motion.  The facts are distilled from the parties' memoranda of law, their Local Rule 56(a)(2) and (3) Statements, affidavits submitted by both parties, exhibits thereto, the responses to this Court's Amended Order (February 18, 2005), with exhibits thereto.

Lane was hired by Compass on September 22, 1999, to work in Compass' kitchen in IBM's Southbury, Connecticut facility.  Her hourly pay was $8.00.  At that time her wages were subject to garnishment by the State of Connecticut for child support.

On March 8, 2000, Lane was backing up with a large doughnut case when she "smashed" her pointer, middle, and ring fingers against a door jam.  Affidavit of Nicole J. Anker (June 30, 2003), ("Def. Aff."), Exhibit C, Manager's Report of Injury (March 8, 2000).  She sustained cuts on two of these fingers.  Lane filed a workers' compensation claim shortly after she was injured.

Lane sought medical treatment the same day she was injured, at which time she was excused from work by her physician until

March 13, 2000.  Plaintiff's Affidavit (July 29, 2003)("Plt. Aff."), Exhibit A.  It appears that each time she was excused from work by her physicians, the order was provided to Compass, although one was tardy. On March 22, she was excused from work until March 30, 2000.  *Id.*, Exhibit B.  She was cleared to return to work on March 31, with the restrictions of no heavy lifting and no use of knives.  *Id.*, Exhibit C.  On March 29, she was excused from work until April 5.  *Id.*, Exhibit D.  On April 5, she was excused until April 12.  *Id.*, Exhibit E.

Plaintiff's first day back to work was May 11, although she was required to appear at a medical examination by Zurich America Insurance Group ("Zurich"), Compass' workers' compensation carrier, at 10:30 a.m., on that same date.  The day after this examination Plaintiff advised her supervisor that she had been referred to a neurologist.  Plaintiff worked until May 22, at which time her physician issued an order of excuse from work, dated May 23, disallowing her return to work until May 31.  *Id.* Exhibit F.  The daily time records kept by Compass show a star next to the date of May 22, with the notation "last day worked." Def. Aff., Exhibit L.[1]/

---

[1]/ With no explanation, Defendant's version of its own document is much more detailed than is the version Plaintiff has submitted, presumably received through discovery.  On Plaintiff's, there are no notations following June 2, whereas Defendant's is complete for the entire month of June with notations of "NCNS" or "no communication."  Defendant's also states, in two places, that Plaintiff's "last day worked" was May 22, whereas Plaintiff's version has just one notation of this fact.  *Cf.* Def. Aff., Exhibit L; Plaintiff's Memorandum of Law (March 8, 2005), Exhibit B.

On May 31, her physician issued a Disability Certificate, indicating that she was totally incapacitated, commencing on that date to an "undetermined" date. Plt. Aff., Exhibit F. Due to the open-ended nature of Plaintiff's total incapacitation, Plaintiff testified that this was the last notice which Plaintiff forwarded to Compass. *See* Def. Aff., Exhibit A, Plaintiff's Deposition at 65. However, in her affidavit, Plaintiff avers, with supporting documents, that, on or about July 6, she provided Compass with two further reports, indicating an inability to return to work, commencing that date. One report disallowed her return until July 30, whereas the second report left return, if any, open-ended. Plt. Aff., Exhibit J. The last written progress report provided with her affidavit indicates a third open-ended disability period, commencing August 30. Plaintiff avers that she faxed same to Defendant on or about August 31. *See Id.* at ¶¶ 13, 15, Exhibit L.

In the meantime, on June 7, Lane's attorney wrote to Zurich, enclosing the May 31 Disability Certificate. In this letter, he further notified Zurich that Defendant had ceased payment of Lane's pay, regardless of the pending workers' compensation claim, to which Compass had not responded at that time. He next requested an immediate reply as to whether she would be getting the "checks", without reference to source, or whether he should request an "emergency hearing" (presumably before the workers'

4

compensation board).  There is nothing in the record as to any reply to and/or result from this letter.  However, in November, 2000 Zurich issued a check to Lane in the amount of $2,005.60, with "payment services" dates denoted as "5/31/00 - 8/09/00" and the date of loss acknowledged as "3/08/00."  The stub of the check provided: "10 week Advance/Payment Made Without Prejudice." Plt. Aff., Exhibit O.  At some point in time following, the parties entered into a confidential, full, and final Settlement Agreement regarding the workers' compensation claim.

While these events were unfolding, Compass entered into its computer system a COBRA Continuation of Coverage Election Form (the "Notice"), addressed to the "Family of Regina Link-Lane." The Notice was dated August 5, and indicated that it was being sent due to the "Qualifying Event" of "Termination of Employment."  The "Qualifying Date" of this termination, as set forth in the Notice, was "5/22/2000".  Plt. Aff., Exhibit K; Def. Aff., Exhibit T.  Creative Mailing Solutions, which contracted with Compass to perform such duties, mailed the Election Form to Lane, which she has conceded she received on August 10.

Prior to August 10, Plaintiff avers that she had never received any form of termination notice, verbal or written, from any person related to Defendant.  Also, she had never received the traditional "pink slip", indicating the date of, and reason for, her termination.  Plt. Aff. at ¶ 14.  Due to this lack of

notice and "pink slip"; the fact that she had a pending worker's compensation claim; that she believed that Compass knew that there existed legal prohibitions against terminating an employee with such a claim pending;[2]/ and that her supervisor, Debrah Rubenstein, had testified in a state court proceeding, <u>Regina Link-Lane v. Kenneth Lane</u>, FA 9504056105, that, had Plaintiff requested that she be allowed to return to work, Rubenstein would have acceded to such request, Hearing Excerpt at 27: l.9-12,[3]/ Plaintiff was of the opinion that she did not have to respond to the COBRA notice. Plaintiff's Aff. at ¶ 15.

---

[2]/ This belief was confirmed by an e-mail, dated September 20, 2002, written by Compass employee Verlean (last name unknown) of Compass' workers' compensation department which read "I am not sure who initiated the termination request to payroll. They do no [sic] inform me when terminating an associate. As you know we inform managers on a daily basis that injured work [sic] with active WC claim status should not be terminated." Plaintiff's Exhibit R. Although Verlean continued that "it would be easy" to determine who has issued the termination order, and when, Defendant's submissions are completely devoid of any further information in this regard. The Court also finds it curious that an examination of the majority of the e-mails of Exhibit R refer to "changing the termination date", which e-mails were written only after Plaintiff called with questions and concerns regarding her benefits on September 9, 2002. Although it was seemingly determined that Verlean was responsible for implementing the "corrected termination date", she responded that she was "sorry I cannot help with this." There is no reference to exactly what the date was to which certain managers felt the termination date should "be corrected", but the fact of the proposition alone is very troubling to this Court.

[3]/ Rubenstein testified "Yes" to the inquiry "If Mrs. Lane were to contact you tomorrow [June 16, 2000] and let you know that she wanted to come back to work on Monday, wold [sic] she be able too [sic]?". Based on such testimony, a reasonable fact finder could infer that Plaintiff, as of June 16, was still employed by Defendant.

**LEGAL ANALYSIS**

## I.  <u>The Standard of Review</u>

In a motion for summary judgment the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  *See also* <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 256 (1986)(plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment).

If the nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof at trial, then summary judgment is appropriate.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Id.* at 322-23.  However, "[i]f, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper."  <u>Gummo v. Village of Depew</u>, 75 F.3d 98, 107 (2d Cir. 1996).

The court is mandated to "resolve all ambiguities and draw all inferences in favor of the nonmoving party. . . ."  <u>Aldrich</u>

v. Randolph Cent. Sch. Dist., 963 F.2d. 520, 523 (2d Cir.), *cert. denied*, 506 U.S. 965 (1992); Heilweil v. Mt. Sinai Hospital, 32 F.3d 718, 721 (2d Cir. 1994).  "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Anderson, 477 U.S. at 255, *quoted in* Keeney v. City of New London, 196 F.Supp.2d 190, 195 (D.Conn. 2002).

"[T]he requirement is that there be no *genuine* issue of *material* fact.  As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 247-48 (emphasis in original).  When reasonable persons, applying the proper legal standards, could differ in their responses to the questions raised on the basis of the evidence presented, the question is best left to the jury.  Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000).

II.  **The Standard As Applied**

A.  **Retaliation Pursuant to Sections 31-290 *et seq*** **of the Connecticut General Statutes**

In the First Count of her Complaint, Lane alleges that she was terminated in retaliation for having filed a worker's compensation claim, pursuant to Conn.Gen.Stat. Sections 31-290 *et seq*.

8

Connecticut courts often turn to federal law for guidance in setting forth the appropriate burdens of proof in various discrimination/retaliation challenges.  *See, e.g.* Ford v. Blue Cross and Blue Shield of Connecticut, 216 Conn. 40, 53 (1990)(retaliation under workers' compensation statutes); Wroblewski v. Lexington Gardens, Inc., 188 Conn. 44, 53 (1982)(court guided by federal law in sex discrimination action); Pik-Kwik Stores, Inc. v. Comm'n on Human Rights and Opportunities, 170 Conn. 327, 331 (1976)(Title VII provides analysis for sex discrimination action).  *See also* Twilley v. Daubert Coated Products Inc., 536 So.2d 1364, 1369 (Ala.1988)(applied federal standards of proof to claims in workers' compensation context).

In the seminal case of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), the United States Supreme Court set forth the basic allocation of burdens and order of presentation of proof in cases involving claims of employment discrimination.  The plaintiff bears the initial burden of proving by a preponderance of the evidence a *prima facie* case of discrimination. *Id.* at 802. In order to meet this burden, the plaintiff must present evidence of an inference of unlawful discrimination.  Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981).  If the plaintiff meets this initial burden, the burden then shifts to the defendant to rebut the presumption of discrimination by

9

producing evidence of a legitimate, non-discriminatory reason for its actions.  McDonnell Douglas, 411 U.S. at 802.  "If the defendant carries this burden of production, the presumption raised by the *prima facie* case is rebutted, and the factual inquiry proceeds to a new level of specificity."  Burdine, 450 U.S. at 255.  The plaintiff must then satisfy her burden of persuading the fact finder that she was the victim of discrimination "either directly by persuading the court [or jury] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  *Id*. at 256.

"To make out a *prima facie* case of retaliation, an employee must show that the employee was engaged in protected activity; that the employer was aware of that activity; that the employee suffered adverse employment decisions; and that there was a causal connection between the protected activity and the adverse employment action."  Collins v. New York City Transit Auth., et al., 305 F.3d 113, 118 (2d Cir. 2002) *quoting* Manoharan v. Columbia Univ. Coll. of Physicians and Surgeons, 842 F.2d 590, 593 (2d Cir. 1998).  *Accord* Holt v. KMI-Continental Inc., 95 F.3d 123, 130 (2d Cir. 1996); *cert. denied*, 520 U.S. 1228 (1997); Kotcher v. Rosa & Sullivan Appliance Ctr., Inc., 957 F.2d 59, 64 (2d Cir. 1992);  DeCintio v. Westchester County Medical Ctr., 821 F.2d 111, 115 (2d Cir. 1987).

Although the burden that must be met by an employment discrimination plaintiff to survive a summary judgment motion at the *prima facie* phase is de minimis, <u>Chambers v. TRM Copy Ctrs., Corp.</u>, 43 F.2d 29, 37 (2d Cir. 1994), Lane fails to do so. She admitted in her responses to Defendant's Second Set of Interrogatories that she has "no direct or indirect evidence that [she] was terminated for having filed a Workers' Compensation claim . . . ." Def. Aff. at Exhibit W, Response 7. Rather, Plaintiff postulated that "[s]ince I had no performance review between September [1999] and March [2000] and since I had been satisfactorily performing my job without complaint from my employer prior to my injury on March 8, 2000, for which I filed a worker's compensation claim, after which my worker's compensation claim was denied, and after which Defendant arbitrarily terminated my health insurance coverage, it is reasonable for me to conclude that I was terminated for having filed a Workers' Compensation claim." *Id.*

Hence, inasmuch as she has conceded that she has no evidence, direct or indirect, of a causal connection between the filing of her worker's compensation claim and her termination, it is beyond cavil she cannot meet the fourth *prima facie* element. In the place of the requisite evidentiary proffer, Lane simply makes unwarranted assumptions, with no viable basis therefor. The Court rejects such meritless assumptions out of hand.

11

Since this record is completely devoid of any evidence from which any reasonable inference could be drawn in favor of Lane, as the opposing party, summary judgment is proper as to the First Count of her Complaint.

**B.    Timeliness of COBRA Notice**

In Count Four of her Complaint, Lane alleges that, following her termination of employment, Compass failed to give her timely notice of certain continued insurance coverage for which she was eligible, pursuant to the notice requirements of COBRA, a subpart of ERISA, as set forth in 29 U.S.C. Section 1166. Initially, Compass moved for summary judgment on this Count, asserting that it had made reasonable efforts to provide Lane with the requisite COBRA notice. This position was taken inasmuch as, up to the date of the memorandum of law, Lane apparently had denied receipt of the COBRA notice.  Memorandum of Law In Support of Motion for Summary Judgment (June 30, 2003) at p.14.  In her Memorandum of Law in Opposition to Motion for Summary Judgment, Plaintiff conceded receipt of the Notice on or about August 10, 2000, but also provided the five reasons, as set forth above at pages 5-6, in support of her belief that no responsive action was required of her. *Id*. (July 30, 2003) at unnumbered p.2.  Lane's legal position remained unchanged as to her assertion of untimely notice.

In Defendant's Reply Memorandum, it took the position that,

12

even taking Lane's contention that she had never received any written or verbal notice of termination at face value, "[t]here is no language in COBRA which requires an employer to inform an employee of the actual termination of employment so long as a COBRA Notice is sent. *See* 29 U.S.C. § 1166." Reply Memorandum (August 21, 2003) at p.6. The Court disagrees with this interpretation of the requirements of Section 1166.

That Section plainly provides, in pertinent part: "The administrator **shall** notify -- (A) in the case of a qualifying event described in paragraph (1),(2),(4), or (6) of Section 1163 of this title, any qualified beneficiary **with respect to such event** . . ." 29 U.S.C. § 1166(a)(4)(A)(emphasis added). If Congress intended to legislate that a qualified beneficiary need not receive notice of the qualifying event until the COBRA Notice is actually sent, it would have been quite simple to do so. It did not. Rather, Section 1166(a)(4)(A) is to the contrary and Defendant cites no other authority for its position.

The Court's early research into this case, and the legal underpinnings therefore, was determinative of the need for additional, required legal analysis. Resultantly, on February 18, 2005, this Court issued an Amended Order, directing the parties to file memoranda of law on the following issues:

A) Whether the COBRA Continuation of Election Form (the "Notice"), dated August 5, 2000, retroactive to May 22, 2000, was

timely Notice from Defendant to Plaintiff herein, pursuant to ERISA, 29 U.S.C. Sections 1163(2) and 1166(a)(2)and (a)(4)(A).

B) The applicability, if any, of ERISA, Civil Enforcement, 29 U.S.C. Section 1132(c)(1), to the present case.[4]

C) The applicability, if any, of ERISA, Civil Enforcement, 29 U.S.C. Section 1132(g)(1), as analyzed in this Circuit pursuant to the standard articulated in <u>Chambless v. Masters, Mates & Pilots Pension Plan</u>, 815 F.2d 869, 871 (2d Cir. 1987), and its progeny, to the present case.[5]

The parties disagree as to the correct responses to the inquiries.  Defendant argues that the Notice was indeed timely; hence, in this litigation, there can be no applicability of punitive Section 1132(c)(1) and the grant of attorneys' fees under Section 1132(g)(1).  In contradistinction, Plaintiff argues that the Notice fails to meet the timeliness requirements of Sections 1163(2) and 1166(a)(2)and (a)(4)(A); therefore, the civil enforcement actions, including punitive fines and attorneys' fees, do indeed come into play herein.

COBRA was enacted as a legislative response to the growing number of Americans without health insurance and the reluctance

---

[4]/ 29 U.S.C. Section 1132(c)(1) provides for monetary penalties, up to $110 per day, for violation of, *inter alia*, the COBRA notice provisions of 29 U.S.C. Sections 1166(1) or (4).

[5]/ Section 1132(g)(1) provides for the grant of attorneys' fees and costs to either party when an action such as the present case is brought by a participant, beneficiary, or fiduciary, in the court's discretion.

of hospitals to treat the uninsured.  Phillips v. Saratoga
Harness Racing, Inc., 240 F.3d 174, 279 (2d Cir. 2001), *citing*
H.R.Rep. No. 241, 99th Cong., 2d Sess. 44, reprinted in 1986
U.S.C.C.A.N. 42, 579, 622.  Through COBRA, Congress amended ERISA
to require that group health plans "provide . . . that each
qualified beneficiary who would lose coverage . . . as the result
of a qualifying event is entitled . . . to elect . . .
continuation coverage under the plan."  29 U.S.C. § 1161(a).
COBRA contains provisions that give certain former employees the
right to temporary continuation of health coverage for themselves
and their families at group rates.  Hartley v. Dillard's, Inc.,
310 F.3d 1054, 1063 n.4 (8th Cir.), *rehearing and rehearing en
banc den'd* (2002).[6]/  In an effort to provide continued access to
affordable private health insurance for qualified beneficiaries,
COBRA compels employers who sponsor group health plans to provide
qualified beneficiaries with the option of receiving self-paid
continuation coverage for eighteen or thirty-six months after a
qualifying event which would otherwise result in termination of
coverage.  29 U.S.C. §§ 1161(a), 1162(2)(A).[7]/  ERISA, as amended
by COBRA, is remedial legislation which should be liberally
construed to effectuate Congressional intent to protect employee

---

[6]/ Inasmuch as Plaintiff was not terminated for "gross misconduct", she is a qualified beneficiary.  29 U.S.C. § 1163(2).

[7]/ In this case, Compass is the plan sponsor, the administrator of the insurance coverage to its present and former employees.

15

participants in employee benefit plans.

It is obvious that the continuation of health coverage is an important concern when a person's employment status changes. Thus, providing timely, appropriate notice of COBRA continuation coverage is a key requirement under COBRA. ERISA, as amended by COBRA, imposes a statutory duty on a "plan sponsor", such as Compass herein, to provide continuation of coverage which is identical to that provided to its current employees. *See* 29 U.S.C. §§ 1002(16)(B), 1161(a), 1162(1). Compass, as a plan sponsor, and an ERISA fiduciary, incurred the responsibility to "discharge [its] duties with respect to a plan solely in the interest of the participants and their beneficiaries . . . (A) for the exclusive purpose of: (I) providing benefits to participants and their beneficiaries . . . ." 29 U.S.C. § 1104(a)(1)(A)(I). ERISA beneficiaries may obtain appropriate equitable relief to redress a fiduciary's breach of these duties. *See* 29 U.S.C. § 1132(a)(3).

In the present case, Compass' Notice to Lane was dated August 5, 2000. Defendant argues that, inasmuch as Lane's termination date was August 3, the Notice was timely for COBRA purposes. However, in the Notice, the "qualifying event", termination of employment, had a "qualifying date" of May 22, 2000. "Qualifying event" is a defined term: ". . . the term 'qualifying event' means, with respect to any covered employee,

any of the following events which, but for the continuation coverage required under this part, would result in the loss of coverage of a qualified beneficiary: .. . (2) **The termination** (other than by reason of such employee's gross misconduct), or reduction of hours, **of the covered employee's employment . . . ."** 29 U.S.C. § 1163(2) (emphasis added).

It is the qualifying event which triggers a health plan administrator's obligations to notify employees and beneficiaries of the right to elect to continue health insurance coverage. Mlsna v. Unitel Communications, Inc., 41 F.3d 1124, 1128 (7th Cir. 1994); Further, under COBRA provisions governing continuation coverage under an ERISA health plan, the eighteen or thirty-six month continuation period runs from the date of the event upon which the employee's loss of benefits occurs. Gaskell v. Harvard Coop. Soc'y, 3 F.3d 495, 501 (1st Cir. 1993). In the present case, it is at this juncture that the legal landscape grows dim.

In arguing that Plaintiff was not terminated on May 22, that the inputting of this date was carelessness having no legal repercussions, Defendant argues that because it continued to pay for Plaintiff's health claims filed after May 22, there was no "qualifying event" within the meaning of COBRA until it terminated her on August 3. Accordingly, the qualifying event could not have been May 22, it postulates.

It is true that CIGNA paid medical bills on Plaintiff's

17

behalf, commencing on May 23 and culminating in mid-October. However, that is only a portion of the entire picture. On December 20, 2000, Accent Insurance Recovery Solutions, on behalf of CIGNA, sent "Request for Refund of Overpayment" to five of Lane's medical providers for the reason that "benefits were terminated prior to the date of service."[8]/ The earliest dates of service for which reimbursement was sought were from May 23 – May 30, 2000. Thus, such Request was for reimbursement for medical services occurring the very day following the qualifying event and the qualifying date as set forth in the Notice. The second Request, for the identical reason, was for service provided on June 20. The third Request was for service rendered between June 26 and September 5. The fourth and fifth Requests were for services rendered on September 18 and October 2, respectively.

Further, in a letter dated November 14, 2000, CIGNA advised Lane that "Our records show that the medical coverage for the above named member[] through **Compass Group USA** began on **January 1, 2000** and terminated on **May 22, 2000**." (emphasis in original).

The next communication was from Compass to the State of Connecticut, dated January 16, 2001, which states, in pertinent part: "Dear Creditor: Compass Group USA is not able to comply

---

[8]/ The parties each referred to payment for medical services rendered after May 22. Defendant simply stated that the payments were made, whereupon Plaintiff submitted one reimbursement request. Upon request of the Court, each party then submitted all five notices.

with the above Garnishment Order for the following reasons:
Debtor is no longer an employee of Compass Group.  Termination
Date: 5/22/2000; and Other: quit, no call, no show."  Plt. Aff.,
Exhibit P.

Finally, on May 24, 2001, the Department of Labor notified
Compass as to a hearing date, June 11, 2001, on Lane's
unemployment compensation claim.  In its fact-finding supplement,
Compass reported that Lane had been terminated on "6/22/00". The
Court agrees with Plaintiff that the date provided was a mere
transcription error and that the document was actually referring
to 5/22/00.  One again, Defendant asserted that the reason for
separation was a "voluntary quit" and that Plaintiff "abandoned
her job. She was a no call, no show."  Compass left blank the
appropriate space, not responding to the question which read:
"Did the individual contend that he/she had a health problem
which rendered the job unsuitable?"

For each, any, or all of these factors, a fact finder could
find that Lane's true termination date for COBRA purposes was May
22; hence, the August 5 Notice was untimely.

To the contrary, Defendant claims, and a fact finder could
find:

> Moreover, there is ample circumstantial
> evidence that Lane's employment was not
> terminated before August 3, 2000.  Lane
> stated in her affidavit that she spoke to her
> supervisor at Compass, Debbie Rubenstein, on
> June 1, 2000, and that Rubenstein confirmed

> that she had received a doctor's note
> excusing Lane on or around May 31, 2000.
> Lane further stated that at or around June 7,
> 2000, she once again saw Rubenstein who said
> nothing about Lane's termination.
> Strikingly, in her opposition to Compass'
> motion for summary judgment, Lane also noted
> that Rubenstein testified on June 15, 2000
> that were Lane to call and state that she was
> ready to return to work, Rubenstein would
> have allowed her to do so at that time
> without providing medical authorization for
> same. Finally, in a log generated by Compass
> concerning Lane's COBRA notice and date of
> termination Compass employees describe the
> May 22, 2000 termination date as an error
> that needed to be "corrected." It is plain,
> then, that May 22, 2000 was <u>not</u> the date on
> which Compass terminated plaintiff's
> employment and is not the "qualifying event"
> for COBRA purposes.

Defendant's Supplemental Rule 56 Memorandum in Response to the

Court's February 22, 2005 Order, at 6, n.5 (emphasis in

original)(citations to record omitted).

Clearly, under the substantive law governing COBRA,

timeliness of the notice of continuation of coverage is a

material fact. Summary judgment, then, is inappropriate on Count

Four of the Complaint. *Accord* <u>Gaskell</u>, 3 F.3d 495, *supra*

(vacating grant of summary judgment and remanding for

determination of qualifying event).

## **CONCLUSION**

Having resolved all ambiguities and drawing all inferences in favor of Plaintiff, as the Court is required to do, Defendant's Motion for Summary Judgment [Doc. No. 26] shall be, and hereby is, GRANTED IN PART AND DENIED IN PART. The claim of retaliatory discharge in Count 1 fails to show any genuine issues of material fact for a fact finder to entertain. However, Plaintiff sets forth sufficient evidence for trial on the question of timeliness of the COBRA notice as set forth in Count 4.

Inasmuch as a trial is called for, the Court will not issue an advisory opinion on the applicability, to this case, of COBRA's civil penalty section for untimely notice, 29 U.S.C. § 1132(c)(1), and for attorneys' fees. 29 U.S.C. § 1132(g)(1).

SO ORDERED

_____
ELLEN BREE BURNS
SENIOR UNITED STATES DISTRICT JUDGE

Dated at New Haven, Connecticut this _____ Day of October, 2005.

21